# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-CV-20522-LEIBOWITZ/Elfenbein

**VICTOR PORFIRIO BALOA DIAZ**, *et al*,

     Plaintiffs,

v.

**EDI KORTA, LLC**, *et al*,

     Defendants.

_____/

## REPORT AND RECOMMENDATION ON PLAINTIFFS/COUNTER-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON DEFENDANT KORTA RECORDS CO.'S THREE COUNTERCLAIMS

     **THIS CAUSE** is before the Court on Plaintiffs/Counter-Defendants Victor Porfirio Baloa Diaz ("Baloa") and Porfi Music, LLC's ("Porfi Music") (collectively, "Plaintiffs") Motion for Summary Judgment on Defendant Korta Records Co.'s ("Korta Records") Counterclaims, (the "Motion"), ECF No. [87].  The Honorable David S. Leibowitz referred this Motion to me for a Report and Recommendation.  ECF No. [102].  Having reviewed the Motion, the Response and Reply, as well as the record[1] and relevant law, I **RECOMMEND** that the Motion, **ECF No. [87]**, be **GRANTED IN PART and DENIED IN PART**.

---

[1] The Court takes the information in this section from the full summary judgment record, including Plaintiffs' Amended Complaint, Defendants' Answers, Korta Records' Counterclaim, Plaintiffs' Answer to the Counterclaim, the Parties' statements of material fact, their responses to each other's statements of material fact, and the documentary evidence on the docket.  *See, e.g.*, ECF No. [36]; ECF No. [53]; ECF No. [54]; ECF No. [55]; ECF No. [56]; ECF No. [57]; ECF No. [60]; ECF No. [83]; ECF No. [84]; ECF No. [85]; ECF No. [87]; ECF No. [97]; ECF No. [98]; ECF No. [100]; ECF No. [101]; ECF No. [109]; ECF No. [112]; ECF No. [113]; ECF No. [128]; ECF No. [129]; ECF No. [130]; *Zurich Am. Ins. Co. v. Nat'l Specialty Ins. Co.*, 246 F. Supp. 3d 1347, 1354–55 (S.D. Fla. 2017).  As required on summary judgment, the Court considers these "facts" in the light most favorable to the non-moving party, meaning Korta Records on Plaintiffs' Motion for Summary Judgment, and Plaintiffs on Defendants' Motion for Summary Judgment.  *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006) ("Even though the facts, as accepted

## I.  INTRODUCTION

This case centers on a dispute between Baloa, a Venezuelan salsa musician and composer, and his former promoter and partner, Defendant Luis F. Mendoza ("Luis").  At the heart of the conflict lies a fractured, longstanding business relationship and the contested ownership over the music and brand associated with the band Adolescentes Orquesta (the "Band").  Since 1995, Baloa composed, arranged, and produced musical compositions and Luis manufactured, promoted, and distributed the music, each sharing in the profits therefrom.  This relationship ended in late 2010 when Baloa allegedly discovered that Luis misrepresented financial earnings and withheld royalties from Baloa.  On February 9, 2024, Plaintiffs filed the instant action asserting claims of copyright infringement against Defendants Korta Records, Luis, Edi Korta, LLC ("Edi LLC"), and Leonor Mendoza ("Leonor") pursuant to the Copyright Act, 17 U.S.C. §§ 101, *et seq.* ("Copyright Act").  *See generally* ECF No. [1]; ECF No. [36].  Therein, Plaintiffs allege that Defendants infringed Baloa's copyrights in the musical composition, the lyrics, and the sound recordings by copying and incorporating the sound recordings via YouTube videos and online streaming platforms.  *See* ECF No. [36] at ¶¶23-52.

On October 3, 2024, Korta Records filed its Counterclaims against Plaintiffs asserting three claims: (1) federal trademark infringement in violation of Section 32 of the Trademark Act of 1946, 15 U.S.C. § 1114; (2) federal unfair competition and false designation of origin in violation of Section 43(a) of the Trademark Act of 1946, 15 U.S.C. § 1125(a); and (3) trademark dilution in violation of Section 495.151 of the Florida Statutes.  *See* ECF No. [56] at 16-20.  On April 21, 2025, Plaintiffs filed the instant Motion seeking summary judgment on Korta Records'

---

at the summary judgment stage of the proceedings, may not be the actual facts of the case," a court's "analysis for purposes of summary judgment must begin with a description of the facts in the light most favorable to the" non-moving party. (citations and quotation marks omitted)).

Counterclaims based on Plaintiffs' first and second affirmative defenses of statute of limitations/laches and acquiescence. *See* ECF No. [87] at 1-2. Plaintiffs also seek summary judgment on Count III for dilution based on Korta Records' alleged failure to present evidence that its purported trademarks are famous. *See id.* Defendants thereafter filed their Response in opposition to the Motion, ECF No. [97], and Plaintiffs filed their Reply in support of the Motion, ECF No. [112]. The Motion has been fully briefed and is ripe for this Court's review.

## II. BACKGROUND[2]

In the 1990's, Luis started the Venezuelan record label Producciones Korta Records C.A. (the "Record Label") and Edi LLC, which would handle the music publishing for the Record Label.[3] *See* ECF No. [84] at ¶¶1-2; ECF No. [100] at ¶¶1-2. In 1995, on behalf of the Record Label, Luis engaged Baloa who composed music and performed under the Band name. *See* ECF No. [84] at ¶3; ECF No. [100] at ¶3. In 1995, Baloa and Luis came to an agreement that Baloa would create music, and Luis would promote the Band, including, *inter alia*, arranging for concerts, promoting the Band's music on the radio, and the creation of records and compact discs for sale. *See* ECF No. [85] at ¶7; ECF No. [97] at ¶7. On August 4, 1995, Baloa and Luis created

---

[2] "All material facts in any party's Statement of Material Facts may be deemed admitted unless controverted by the other party's Statement of Material Facts, provided that: (i) the Court finds that the material fact at issue is supported by properly cited record evidence; and (ii) any exception under Fed. R. Civ. P. 56 does not apply." S.D. Fla. L.R. 56.1(c). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may… consider the fact undisputed for purposes of the motion…" Fed. R. Civ. P. 56(e). Plaintiffs only disputed part of Defendants' statements in paragraphs 1-5. Anything not expressly disputed is, therefore, deemed admitted.

[3] On April 2, 2019, Plaintiff does not dispute that Luis and Leonor created Korta Records as the Florida entity and counterpart to the Record Label. *See* ECF No. [84] at ¶30; ECF No. [100] at ¶30. The record also supports this fact. *See* ECF No. [84-30]; ECF No. [128] at 66:24-67:25. Defendants allege, and Plaintiffs dispute, that on or about January 19, 2019, the Record Label and Korta Records entered into a "License Agreement" whereby the Record Label granted Korta Records a non-exclusive license to use, distribute, and promote the "Adolescentes Orquesta" catalog as owned by the Record Label. *See* ECF No. [84] at ¶31; ECF No. [100] at ¶31. The authenticity of the License Agreement remains disputed.

a Venezuelan company called Adolescent's Orquesta, C.A.  *See* ECF No. [100] at ¶38; ECF No. [128-1] at 47:15-48:11.[4]  The founding document for Adolescent's Orquesta, C.A. memorializes that Luis owned 60 percent of the shares of the company while Baloa owned 40 percent.  *See* ECF No. [100] at ¶39; ECF No. [128-1] at 47:15-50:4.

On or about September 9, 2010, Baloa and Luis agreed to discuss various topics, including, "the assignment of rights on the 'Adolescentes' trademarks," and the royalties Luis allegedly owed Baloa.  *See* ECF No. [85-17]; ECF No. [128-1] at 93:12-97:8.  The Parties dispute whether the meeting occurred and an agreement was reached.  *See id*.  By November 2010, Baloa and Luis ended their business relationship.  *See* ECF No. [85] at ¶22; ECF No. [98] at ¶22.

Korta Records alleges that, since at least 1995, it has continuously used various marks, including "Adolescent's Orquesta," "Adolescentes Orquesta," "Los Adolescentes," "Orquesta Adolescent's," and similar derivatives thereof, related to the Band in the entertainment industry in the United States and internationally.  *See* ECF No. [56] at ¶¶1-3, 15-16.  On July 9, 2010, a trademark application for "ADOLESCENT'S ORQUESTA" (the "Korta Mark") was filed with the U.S. Patent and Trademark Office (the "USPTO") and received registration on May 3, 2011.  The Parties dispute whether the Record Label or a non-existing entity, Korta Records, C.A., applied for the trademark.  *See* ECF No. [57-1] at 1; ECF No. [98-1]; ECF No. [113-3]; ECF No. [113] at ¶28.  On July 7, 2011, Baloa applied to register the trademark "PORFI BALOA Y SUS ADOLESCENTES" (the "Baloa Mark") and received registration on July 17, 2012, with its first use in commerce on April 14, 2012.  *See* ECF No. [85] at ¶24; ECF No. [98] at ¶24; ECF No. [85-5]; ECF No. [85-6].

---

[4] Defendants did not file a Reply Statement of Material Facts controverting Plaintiffs' additional facts filed with their Response to Plaintiff's Statement of Material Facts, ECF No. [100], as required by Local Rule 56.1(a)(3), (b)(3).  Accordingly, these facts are deemed admitted.  *See* S.D. Fla L.R. 56.1(c).

On December 18, 2012, Luis's son, Carlos A. Mendoza, through his Florida company, Playback Productions, Inc. ("Playback"), applied to register the trademark "LOS ADOLESCENTES" (the "Los Adolescentes Mark"). *See* ECF No. [85] at ¶25; ECF No. [98] at ¶25. Luis knew that Playback applied for the Los Adolescentes Mark but claims that he alone owns the Los Adolescentes Mark; neither Playback nor his sons owns the name Los Adolescentes and the Los Adolescentes Mark. *See* ECF No. [128-1] at 32:2-33:12. Luis testified that he owns the Band and he uses the names "Adolescentes Orchestra," "Los Adolescentes" and derivatives thereof interchangeably to refer to the same entertainment services. *See* ECF No. [85] at ¶25(d); ECF No. [85-11]; ECF No. [113-7]; ECF No. [128-1] at 31:18-33:12. On April 4, 2013, the USPTO refused registration of the Los Adolescentes Mark due to a likelihood of confusion with the Baloa Mark (the "USPTO Proceedings"). *See* ECF No. [85] at ¶25(b); ECF No. [98] at ¶25(b). On September 27, 2013, attorney Pierre Hachar ("Hachar") responded to the USPTO's refusal on Playback's behalf arguing that Baloa's Mark constituted trademark infringement ("Playback's USPTO Response"). *See* ECF No. [85-10] at 5-6. On October 16, 2013, Playback, through Hachar, filed a petition to cancel the Baloa Mark (the "Cancellation Petition"), which was later dismissed with prejudice. *See* ECF No. [85] at ¶25(d); ECF No. [85-11]; ECF No. [113-7]. Luis denies affiliation with Playback, its responsibilities in managing the Band, and its involvement with the trademark dispute. *See* ECF No. [128-1] at 31:11-35:24, 111:12-112:22.

On April 16, 2014, Baloa sued Playback, Luis as well as his sons and daughter (Luis F. Mendoza, Jr., Carlos A. Mendoza, and Leonor), and Edi Korta Music, Inc. (collectively, "State Defendants") in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County (the "2014 Action"). In the 2014 Action, Baloa alleges that the State Defendants failed to pay Baloa for the music royalites and other business torts. *See* ECF No. [85-14]. Baloa expressly

limited the 2014 Action to exclude questions regarding the validity of the State Defendants' trade name registrations. *See id.* at n. 1. Baloa alleges that to avoid litigation, he "initially decided to change [Baloa's group's] name to "Porfi Baloa y sus Adolescentes." *See* ECF No. [85-14] at ¶50. Baloa alleges that he attempted to use the new name to schedule performances, but these were eventually cancelled due to the State Defendants' actions. *See* ECF No. [85-14] at ¶51. The State Defendants denied knowledge of these allegations. *See* ECF No. [85-15] at ¶¶50-51. The State Defendants did, however, admit that Luis owned the Band, and the name "Los Adolescentes," and that Luis's group performed using the name "Los Adolescentes," asserting that it was a continuation of the original group Luis owned since the mid-1990s. *See* ECF No. [85-15] at ¶¶45-49.

On February 22, 2019, the USPTO cancelled the Baloa Mark due to Baloa's failure to file an acceptable declaration under Section 8 of the Trademark Act demonstrating the continued use of the mark in commerce. *See* ECF No. [98] at ¶30; ECF No. [98-3]. On September 11, 2020, Korta Records filed its trademark application for "Adolescentes Orquesta" and received registration on January 17, 2023 (collectively with the Korta Mark, the "Korta Marks") . *See* ECF No. [98-2]; ECF No. [98] at ¶29. Defendants assert that Leonor and Luis have been aware of Baloa's attempt at using the Baloa Mark; "however, it is only recently that []Baloa's use has caused confusion amongst the public, including promoters and consumers." *See* ECF No. [98] at ¶32. Luis testified that, as soon as he discovered Baloa's use of Baloa's Mark, he filed a lawsuit around the "time of the pandemic." *See* ECF No. [128-1] at 111:12-112:22.

## III.   LEGAL STANDARDS

### A.  Summary Judgment Standard

A court may grant a motion for summary judgment "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). An issue is genuine if "a reasonable trier of fact could return judgment for

the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243

(11th Cir. 2008). And a fact is material if it "would affect the outcome of the suit under the

governing law." *Id.* "The mere existence of a scintilla of evidence in support of" the non-moving

party's "position will be insufficient; there must be evidence on which the jury could reasonably

find for the" non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

The Court views the facts in the light most favorable to the non-moving party and draws

all reasonable inferences in that party's favor. *See Davis*, 451 F.3d at 763. "Even when the parties

agree on the basic facts, summary judgment is inappropriate if reasonable minds might differ on

the inferences to be drawn from those facts." *Carlin Commc'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802

F.2d 1352, 1356 (11th Cir. 1986). The Court "may not weigh conflicting evidence to resolve

disputed factual issues; if a genuine dispute is found, summary judgment must be denied." *Id.*; *see

also Skop v. City of Atlanta*, 485 F.3d 1130, 1140 (11th Cir. 2007).

The moving party shoulders the initial burden to demonstrate the absence of a genuine

issue of material fact. *See Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). If the movant

satisfies this burden, the non-moving party "must do more than simply show that there is some

metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986). Instead, the non-moving party must "make a showing sufficient to

establish the existence of an element essential to that party's case, and on which that party will

bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To do that,

the non-moving party "must present evidence beyond the pleadings showing that a reasonable jury

could find in its favor." *See Shiver*, 549 F.3d at 1343. This standard applies equally to defendants

seeking summary judgment based on their affirmative defense; "[t]he reason is that the defendant bears the burden of proof on his or her affirmative defense at trial." *See Special Purpose Accounts Receivable Co-op Corp. v. Prime One Capital Co.*, 125 F. Supp. 2d 1093, 1098-99 (S.D. Fla. 2000) (citing *Thorsteinsson v. M/V Drangur,* 891 F.2d 1547, 1550–51 (11th Cir.1990)).  This evidence can include the party's "own affidavits," along with "depositions, answers to interrogatories, and admissions on file." *See Zurich Am. Ins. Co.*, 246 F. Supp. 3d at 1355; *see also* Fed. R. Civ. P. 56(c)(1)(A).

Still, the court "cannot base the entry of summary judgment on the mere fact that" the non-moving party fails to respond to a fact or argument made by the movant "but, rather, must consider the merits of the motion." *See United States v. One Piece of Real Prop. Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004).  Even where the non-moving party does not properly put any alleged material facts in controversy, the Court cannot grant summary judgment unless it "review[s] the full record on summary judgment," *Reese v. Herbert*, 527 F.3d 1253, 1271 (11th Cir. 2008), and is satisfied that the record "supports the uncontroverted material facts that the movant has proposed," *Zurich Am. Ins. Co.*, 246 F. Supp. 3d at 1355.

## B.  Trademark and Unfair Competition Law

### 1.  Federal Trademark Infringement (15 U.S.C. § 1114)

"Section 32 of the Lanham Act, 15 U.S.C. § 1114, provides liability for trademark infringement if, without the consent of the registrant, a defendant uses 'in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark: which is likely to cause confusion, or to cause mistake, or to deceive.'" *Chanel, Inc. v. Replicachanelbag*, 362 F. Supp. 3d 1256, 1259 (S.D. Fla. 2019) (quoting 15 U.S.C. § 1114).  "To prevail on a trademark infringement claim under 15 U.S.C. § 1114, the plaintiff must show that it owns a valid trademark,

that its mark has priority, that the defendant used such mark in commerce without the plaintiff's consent, and that the defendant's use is likely to cause consumer confusion as to the source, affiliation or sponsorship of its goods or services." *Carnival Corp. v. SeaEscape Casino Cruises, Inc.*, 74 F. Supp. 2d 1261, 1264–65 (S.D. Fla. 1999); *see also Chanel, Inc.*, 362 F. Supp. 3d at 1262 (consolidating those four elements into two: plaintiff "had prior rights to the mark at issue" and defendants "adopted a mark or name that was the same, or confusingly similar to" it "such that consumers were likely to confuse the two").

"In determining the likelihood of confusion, the court must analyze the following seven factors: (1) the type of trademark; (2) the similarity of the marks; (3) the similarity of the products the marks represent; (4) the similarity of the parties' retail outlets and purchasers; (5) the similarity of the advertising media used; (6) the defendant's intent; and (7) actual confusion." *Carnival Corp.*, 74 F. Supp. 2d at 1265. "The issue of likelihood of confusion is not determined by merely analyzing whether a majority of the subsidiary factors indicates that such a likelihood exists. Rather, a court must evaluate the weight to be accorded the individual factors and then make its ultimate decision. The appropriate weight to be given to each of these factors varies with the circumstances of the case." *Suntree Techs., Inc. v. Ecosense Int'l, Inc.*, 693 F.3d 1338, 1346 (11th Cir. 2012) (citations omitted). "Of these factors, the type of mark and the evidence of actual confusion are the most important in this circuit," *Dieter*, 880 F.2d at 326, but actual confusion "is obviously not a prerequisite to a finding of likelihood of confusion, as it is one of seven factors considered in the likelihood-of-confusion determination," *Wreal, LLC*, 38 F.4th at 137.

### 2. Federal Unfair Competition/False Designation of Origin (15 U.S.C. § 1125(a))

"Section 43(a) of the Lanham Act creates a federal cause of action for unfair competition in interstate commerce, and forbids unfair trade practices involving infringement of trademarks,

even in the absence of federal trademark registration." *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 647 (11th Cir. 2007) (alteration adopted, quotation marks omitted). "To state a claim for unfair competition and false designation of origin, a plaintiff must show (1) that the plaintiff had enforceable trademark rights in the mark or name, and (2) that the defendant made unauthorized use of it such that consumers were likely to confuse the two," *Brain Pharma, LLC v. Scalini*, 858 F. Supp. 2d 1349, 1355–56 (S.D. Fla. 2012) (quotation marks omitted), which are the same elements required "to prevail on [a] federal claim of trademark infringement," *Suntree Techs.*, 693 F.3d at 1346. *Cf. Chanel, Inc.*, 362 F. Supp. 3d at 1262 (explaining that the "test for liability for false designation of origin under 15 U.S.C. § 1125(a) is the same as for a trademark counterfeiting and infringement claim – i.e., whether the public is likely to be deceived or confused by the similarity of the marks at issue").

### 3. Florida Common Law Unfair Competition and Trademark Infringement

"Courts may use an analysis of federal infringement claims as a measuring stick in evaluating the merits of state law claims of unfair competition." *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193 n.4 (11th Cir. 2001). Indeed, "analysis of the Florida statutory and common law claims of trademark infringement and unfair competition is the same as under the federal trademark infringement claim." *Gift of Learning Found., Inc. v. TGC, Inc.*, 329 F.3d 792, 802 (11th Cir. 2003); *Brain Pharma*, 858 F. Supp. 2d at 1359 (noting that a plaintiff's failure "to state claims for trademark infringement, unfair competition and false designation of origin, and trademark dilution under federal law," also extinguishes its claims under Florida law); *Provide Commerce, Inc. v. Preferred Commerce, Inc.*, No. 07-CV–80185, 2008 WL 926777, at *4 (S.D. Fla. Apr. 4, 2008) ("[B]oth the Federal and Florida state causes of action for dilution involve the same principles.")

"To establish a dilution claim, a plaintiff must provide sufficient evidence that (1) the mark is famous; (2) the alleged infringer adopted the mark after the mark became famous; (3) the infringer diluted the mark; and (4) the defendant's use is commercial and in commerce." *Brain Pharma*, 858 F. Supp. 2d at 1356 (quotation marks omitted). "A mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." *Id.* at 1357 (quotation marks omitted). "Trademark dilution claims[] are limited to truly famous marks such as Budweiser beer, Camel cigarettes, and Barbie dolls." *Id.* (quotation marks omitted); *see also Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 91 F. Supp. 3d 1265, 1286 (S.D. Fla. 2015) ("To be famous in the context of a trademark dilution claim, the mark must have a degree of distinctiveness and strength beyond that needed to serve as a trademark; it must be truly prominent and renowned." (quotation marks omitted)); *Michael Caruso & Co. v. Estefan Enters., Inc.*, 994 F. Supp. 1454, 1463 (S.D. Fla. 1998) (noting that "Congress has provided examples of marks constituting trade dilution: Dupont shoes, Buick aspirin, Kodak pianos" (quotation marks omitted)). For that reason, it "is well-established that dilution fame is difficult to prove." *See Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1373 (Fed. Cir. 2012). "[F]ame for dilution is an either/or proposition — it either exists or does not" — and proving it requires a "stringent showing." *See id.* (quotation marks omitted).

Being "distinctive in its particular market" is not enough "to engender immediate recognition in the general public." *See Estefan Enters., Inc.*, 994 F. Supp. at 1463. Instead, to "establish the requisite level of fame, the mark's owner must demonstrate that the common or proper noun uses of the term" have been "eclipsed by the owner's use of the mark." *See Coach Servs., Inc.*, 668 F.3d at 1373 (quotation marks omitted). An owner "must show that, when the general public encounters the mark in almost any context, it associates the term, at least initially,

with the mark's owner." *See id.* (quotation marks omitted). Courts applying Florida's dilution statute evaluate fame based on several factors, including: (1) inherent or acquired distinctiveness of the mark; (2) duration and extent of use; (3) advertising and publicity; (4) geographical extent of trading area; (5) channels of trade; (6) degree of recognition within those channels; (7) third-party use; and (8) federal or state trademark registration. *See* Fla. Stat. § 495.151(1)(a)-(h); *Fla. Int'l Univ. Bd.*, 91 F. Supp. 3d at 1286. Failure to proffer substantial evidence satisfying these criteria results in dismissal of the dilution claim. *Brain Pharma*, 858 F. Supp. 2d at 1357.

### C. Affirmative Defenses

#### 1. Statute of Limitations and Laches in Trademark Actions

"The equitable defense of estoppel by laches may be applied to bar . . . Lanham Act [claims]." *Pinnacle Advert. & Mktg. Group, Inc. v. Pinnacle Advert. & Mktg. Group, LLC*, 7 F.4th 989, 1005 (11th Cir. 2021) (quoting *Kason Indus., Inc. v. Component Hardware Grp., Inc.*, 120 F.3d 1199, 1203 (11th Cir. 1997). "Though the doctrine is an equitable doctrine that should be applied flexibly, a defendant must demonstrate the presence of three elements in order to successfully assert laches as a defense: (1) a delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted." *Pinnacle*, 7 F.4th at 1005 (quoting *Kason*, 120 F.3d at 1203) (internal quotations omitted); *see also AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531, 1545 (11th Cir. 1986).

The Eleventh Circuit "calculates delay from the moment 'the plaintiff knows or should know [it] has a provable claim for infringement.'" *Pinnacle*, 7 F.4th at 1006 (quoting *Kason*, 120 F.3d at 1206). Because trademark infringement and unfair competition claims both hinge on a likelihood of confusion, a "provable claim for infringement" arises when the plaintiff knew or should have known that such a likelihood of confusion existed between the two marks. *See id.*

This Circuit also "applies the period for analogous state law claims as the touchstone for laches." *Kason*, 120 F.3d at 1203 (citing *AmBrit*, 812 F.2d at 1546). "The analogous Florida limitations period for this type of action is four years." *Pinnacle*, 7 F.4th at 1005 (citing Fla. Stat. § 95.11(3)). In considering delay, the Eleventh Circuit recognizes the doctrine of progressive encroachment, under which the delay period does not start until the alleged infringer significantly expands or intensifies its infringing activities, causing a heightened risk of consumer confusion. *See Kason*, 120 F.3d at 1206; *Pinnacle*, 7 F.4th at 1008.

In assessing the second element of laches, courts examine whether the plaintiff can offer an adequate justification for the delay in bringing suit. *Pinnacle*, 7 F.4th at 1009. "The excuse requirement ensures that '[a] trademark owner cannot simply wait without explanation to see how successful the defendant's business will be and then [sue] to take away [the] good will developed by defendant in the interim.'" *Id*. (citing 6 *McCarthy on Trademarks and Unfair Competition* § 31:14 (5th ed. 2021)). As to the final element of laches, a delay in filing suit does not, on its own, defeat an infringement claim unless the defendant can show the delay caused harm. *See Pinnacle*, 7 F.4th at 1009. Courts recognize two types of prejudice from delay in trademark suits: evidentiary prejudice (lost or degraded evidence, unavailable witnesses, faded memories) and economic prejudice (defendant's detrimental reliance on the plaintiff's inaction). *See id*. at 1010 (citing 6 *McCarthy on Trademarks and Unfair Competition* § 31:14 (5th ed. 2021)).

## 2. Acquiescence in Trademark Actions

The defense of acquiescence in a trademark infringement action requires the defendant to prove three elements: (1) the plaintiff actively represented that it would not assert a right or claim against the defendant; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused undue prejudice to the defendant. *Univ. of Ala.*

*Bd. of Trs. v. New Life Art, Inc.*, 683 F.3d 1266, 1281 (11th Cir. 2012); *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1207 (11th Cir. 2008).   "The difference between acquiescence and laches is that laches denotes passive consent and acquiescence denotes active consent."  *Id.* (quoting *Angel Flight*, 522 F.3d at 1207).   "Active consent" may be express or implied, requiring conduct by the plaintiff that reasonably suggests assurances that it would not enforce trademark rights.  *Coach House Rest., Inc. v. Coach & Six Rests., Inc.*, 934 F.2d 1551, 1558 (11th Cir. 1991); *Univ. of Ala. Bd.*, 683 F.3d at 1281-82.

## IV.    DISCUSSION

As noted above, Plaintiffs move for summary judgment on Defendants three Counterclaims: (1) Federal Trademark Infringement; (2) Federal Unfair Competition and False Designation of Origin; and (3) Florida Trademark Dilution.  *See* ECF No. [56] at 16-20.  Plaintiffs base their motion on their affirmative defenses of laches and statute of limitations (First Affirmative Defense) and acquiescence (Second Affirmative Defense).  *See* ECF No. [87] at 7. Because Plaintiffs bear the burden of proof on these defenses at trial, they must demonstrate the absence of any genuine issue of material fact and "present evidence beyond the pleadings showing that a reasonable jury could find in its favor."  *See Shiver*, 549 F.3d at 1343; *Special Purpose*, 125 F. Supp. 2d at 1098; *Matsushita*, 475 U.S. at 586.

Plaintiffs also argue that, with respect to Count III (dilution), Korta Records has failed to produce evidence creating a genuine dispute as to whether its purported trademarks are sufficiently famous.  *See* ECF No. [87] at 1-2.  On this claim, Plaintiffs need only show the absence of a genuine issue of material fact to shift the burden.  Because Korta Records bears the burden of proof at trial, it must then present sufficient evidence for a reasonable jury to find in its favor on the issue

of fame. *See Shiver*, 549 F.3d at 1343; *Special Purpose*, 125 F. Supp. 2d at 1098; *Matsushita*, 475 U.S. at 586.

### A. First Affirmative Defense: Statute of Limitations/Laches

To successfully invoke the laches defense, Plaintiffs must establish that: (1) Korta Records delayed asserting its trademark rights; (2) Korta Records' delay was inexcusable; and (3) Korta Records' delay unduly prejudiced Plaintiffs. *See AmBrit*, 812 F.2d at 1545.

### 1. Delay

The Eleventh Circuit has clarified that the delay period is measured from the point at which the plaintiff knew or should have known that it had a provable claim for trademark infringement. *See Kason*, 120 F.3d at 1206; *Pinnacle*, 7 F.4th at 1006–08. That is, a plaintiff's mere awareness of another entity's existence or its use of a similar mark does not trigger delay. *See Kason*, 120 F.3d at 1206; *Pinnacle*, 7 F.4th at 1008. Instead, the period begins when consumer confusion — or the likelihood of confusion — becomes sufficiently apparent to the plaintiff. *See Kason*, 120 F.3d at 1206; *Pinnacle*, 7 F.4th at 1006–08. In this respect, the Eleventh Circuit situates the doctrine of progressive encroachment within the delay element of laches. *See Kason*, 120 F.3d at 1206; *Pinnacle*, 7 F.4th at 1008.

Progressive encroachment recognizes that a junior user's activities may evolve over time, such that the likelihood of confusion is not immediately actionable. Under the doctrine, when "a defendant begins use of a trademark . . . in the market" and only later "directs its marketing or manufacturing efforts such that it is placed more squarely in competition with the plaintiff," we calculate delay from the later period because only then did the plaintiff "know [it] ha[d] a provable claim for infringement." *Pinnacle*, 7 F.4th at 1008 (quoting *Kason*, 120 F.3d at 1205). Thus, the

"delay" element is tied to when the infringement ripens into an actionable claim, not to when the plaintiff first learned of the defendant's existence or use.

Here, Plaintiffs must establish that there is no dispute of material fact that, before October 2020 (four years prior to filing the Counterclaims), Korta Records knew, or should have known, of Plaintiffs' use of Baloa's Mark and that use had caused, or was likely to cause, consumer confusion. *See Kason*, 120 F.3d at 1206 (stating the applicable statute of limitations period is four years); *Pinnacle*, 7 F.4th at 1005 (same); *AmBrit*, 812 F.2d at 1546 (same). As an initial concern, Plaintiffs have not articulated with precision the timing or manner of their ***use*** of the Baloa Mark, nor have they produced evidence demonstrating that such use was likely to cause consumer confusion. Instead, Plaintiffs rely primarily on the date of Baloa's registration of his Mark. That reliance is misplaced. The Eleventh Circuit has not directly decided whether trademark registration alone is enough to trigger laches, but its precedent favors measuring delay from real-world infringing use that would trigger consumer confusion. *See Kason*, 120 F.3d at 1206; *Pinnacle*, 7 F.4th at 1006–08.[5] As noted in *Pinnacle*, mere awareness of another entity's existence

---

[5] The First Circuit has expressly held that, when analyzing the equitable defense of laches, a trademark owner is placed on notice only by real-world events demonstrating infringing use, not by a statutorily created "constructive notice" of a registration. *See Valmor Prods. Co. v. Standard Prods. Corp.*, 464 F.2d 200, 204 (1st Cir. 1972). The Court finds the First Circuit's reasoning persuasive. Laches is an equitable doctrine designed to prevent prejudice by requiring a trademark owner to act once it is on notice that a defendant's use of a mark creates a provable claim of infringement by likelihood of confusion. Statutory constructive notice of a registration does not accomplish that purpose because it does not provide the true trademark owner with notice of actual or likely confusion arising from significant infringing use in the marketplace. Indeed, a 2012 study conducted by the USPTO found that nearly fifty percent of registered marks were not in actual use on some or all of the listed goods or services. *See* Barton Beebe & Jeanne C. Fromer, *Fake Trademark Specimens: An Empirical Analysis*, 120 Colum. L. Rev. Forum 217 (2020) (citing PTO, Post Registration Proof of Use Pilot Status Report 1 (2014), http://www.uspto.gov/trademarks/notices/Post_Registration_Proof_of_Use.doc). This reality underscores why registration alone cannot reasonably be deemed sufficient to put a trademark owner on notice of infringement for laches purposes. The equitable nature of laches demands notice rooted in practical marketplace conditions, not the legal fiction of statutory constructive notice.

or its use of a similar name does not automatically trigger the laches clock. *See Pinnacle*, 7 F.4th at 1008. Rather, actionable notice arises specifically when the plaintiff knows or should know about the likelihood of confusion the infringement caused. *Id*.

Accordingly, even if Plaintiff established that Korta Records had knowledge of the Baloa Mark's registration, these allegations alone do not necessarily establish that Korta Records knew or reasonably should have known of a provable infringement claim, as opposed to merely knowing about Plaintiffs' existence or their trademark registration. Without more, the Court cannot conclude as a matter of law that knowledge of the Baloa Mark's registration could constitute notice for laches.

Setting aside this initial deficiency, Plaintiffs fail to establish the knowledge element on additional grounds. Plaintiffs argue that Luis had actual or constructive knowledge based on his involvement in the 2014 Action and from knowledge imputed to him through Playback and Hachar. *See* ECF No. [87] at 7. First, as to Luis's own knowledge obtained from the 2014 Action, Plaintiffs argue the 2014 Action sufficiently notified Luis of Baloa's use of his Mark to trigger the laches delay period. *See id*. It is undisputed that, on April 16, 2014, Baloa sued Luis, his sons, Playback, Leonor, and Edi Korta Music, Inc. in state court for several business torts. *See* ECF No. [85] at ¶26; ECF No. [98] at ¶26. The Parties also do not dispute the 2014 Action's allegations, but the legal significance thereof. *See* ECF No. [85] at ¶26 (a)-(b); ECF No. [98] at ¶26. It is undisputed that the 2014 Action made reference to Luis's legal rights to use the Band's formal and informal names. *See* ECF No. [85]-14 at ¶49. The 2014 Action, however, expressly disclaims that it challenges "the validity of Defendants' tradename registrations," which are "beyond the scope of this lawsuit." *See* ECF No. [85-14] at n.1.

Most relevant here, the 2014 Action alleges that "[r]ather than opting to become embroiled in costly and time-consuming legal battle with [Luis]…, the Plaintiff ***initially decided*** to change the Group's name to 'Porfi Baloa y sus Adolescentes.'"  *See* ECF No. [85]-14] at n.1 (emphasis added).  Further, the 2014 Action alleges that Baloa has been unable to perform any scheduled shows under the new name due to the State Defendants' threats and instructions to the venues to cancel Baloa's performances.  *See* ECF No. [85-14] at ¶¶51-52.  The 2014 Action expressly states that the State Defendants would call venues to advise them "that [Baloa's] Group had no right to perform under the new moniker, demand that they cancel the performance, and threatening to sue the owners of the venues if they failed to cancel the performance."  *See* ECF No. [85-14] at ¶51.  Moreover, Luis's answer to these allegations disclaims knowledge of these events.  *See* ECF No. [85-15] at ¶¶51-52.

These facts fail to foreclose a genuine dispute as to Luis's knowledge.  In the 2014 Action, Baloa alleges that to avoid litigation, he "***initially*** decided to change [Baloa's group's] name to 'Porfi Baloa y sus Adolescentes,'" but Defendants stopped his attempts at using the new name. *See* ECF No. [85-14] at ¶¶50-51 (emphasis added).  Indeed, Plaintiffs' allegations relating to the 2014 Action primarily document Plaintiffs' ***intent*** to use the Baloa Mark, rather than demonstrating actual use and consumer confusion.  To the contrary, these allegations seemingly demonstrate that Baloa's use of his Mark never made it to the consuming public.  Plaintiffs' arguments that these allegations are sufficient to constitute notice to Luis misses the important distinction between mere notice of another entity's trademark use, and actual awareness of consumer confusion — a critical factor under the Eleventh Circuit's reasoning in *Pinnacle* and *Kason*.

Had the burden shifted to Korta Records, it would have equally failed to prove that Plaintiffs' activities only recently crossed the threshold into infringing activity as the evidence is contradictory on this point.  Korta Records contends that the deposition testimony of Luis and Leonor shows it is Plaintiffs' recent use of the Baloa Mark — not their use prior to 2014 — that has caused, and will continue to cause, confusion among the public.  *See* ECF No. [97] at 7.  Luis testified that he first learned of Plaintiffs' use of the Baloa Mark around the time of the pandemic.  *See* ECF No. [128] at 112:1-7.  Leonor's testimony contradicts this, however; when questioned about the 2014 Action and whether Leonor and Luis knew that Baloa changed his band's name to "PORFI BALOA Y SUS ADOLESCENTES," Leonor acknowledged that "[Baloa] always used it, like, my dad said.  He's always used the name. . ."  *See* ECF No. [129] at 19:4-16.  Leonor explained that her and Luis's concern is the confusion the Baloa Mark could create among promoters and the public.  *See* ECF No. [129] at 19:15-20:19.  Her testimony is unclear whether actual confusion did occur.  *See id.*  She testified that she and Luis preferred Baloa's use of the name "El Klan de Porfi," which he sometimes used.  *See* ECF No. [129] at 20:7-15.  With much to be desired, neither Party forecloses the genuine dispute of material fact.  Whether Plaintiffs' activities in 2014 rose to the level of infringing conduct likely to cause confusion, or whether they only crossed that threshold in more recent years, involves a disputed fact-intensive inquiry inappropriate for the Court to decide on summary judgment.  Nor is it the Court's duty to search through the record evidence to find evidence to support the Parties' positions.  *See Murthy v. Missouri*, 603 U.S. 43, 67 (2024) ("[j]udges are not like pigs, hunting for truffles buried [in the record].")

Plaintiffs' secondary argument seeks to impute the knowledge of a separate company onto Korta Records without first establishing a legal basis on which to do so.  Instead, Plaintiffs rely on

the familial relationship between the principals of Korta Records and Playback, and competing ownership claims by Luis and Playback over the Los Adolescentes Mark. Specifically, Plaintiffs argue that Luis knew about Baloa's use of his Mark when Luis's sons, through Playback, applied for the Los Adolescentes Mark in 2013.  The undisputed facts show that:

(1) Luis's sons own and operate Playback, but Luis's control and involvement with Playback is disputed. *see* ECF No. [85] at ¶25; ECF No. [98] at ¶25;

(2) Playback applied to register the Los Adolescentes Mark, and Luis knew about this application, *see* ECF No. [85] at ¶25; ECF No. [98] at ¶25; ECF No. [128-1] at 32:2-33:12;

(3) Nevertheless, Luis has always claimed ownership over the name "LOS ADOLESCENTES" and maintains that he has been using and has had ownership since 1995, *see* ECF No. [85] at ¶25(d); ECF No. [85-11]; ECF No. [113-7]; ECF No. [128-1] at 31:18-33:12;

(4) The USPTO refused Playback's application because the Los Adolescentes Mark was confusingly similar to Baloa's Mark, *see* ECF No. [85] at ¶25(b); ECF No. [98] at ¶25(b);

(5) By September 27, 2013, Playback knew or had reason to know that Baloa's use of his Mark was confusingly similar to Los Adolescentes, *see* ECF No. [85] at ¶25(c); ECF No. [98] at ¶25(c);  and

(6) On October 16, 2013, Playback, through its counsel, Hachar, submitted the Cancellation Petition, *see* ECF No. [85] at ¶25(d); ECF No. [98] at ¶25(d).

The key dispute that Plaintiffs fail to overcome is whether Playback's knowledge may be imputed to Luis.  Luis testified that he had no affiliation with Playback, its responsibilities in managing the Band, or its involvement with the trademark dispute.  *See* ECF No. [128-1] at 31:11-35:24, 111:12-112:22; ECF No. [97] at 6; ECF No. [98] at n.1.  Luis also testified that the "Luis F. Mendoza" reflected on Playback's corporate documents is not Defendant Luis F. Mendoza but Luis's son.  *See* ECF No. [85-8].  Korta Records argues that it cannot be charged with knowledge of Baloa's use of Baloa's Mark because Luis's sons operated Playback, not Luis himself.  *See* ECF No. [98] at n.1.  Plaintiffs also cite Luis and Playback's competing claims to ownership over the

Los Adolescentes Mark, the inconsistencies in the corporations' formation dates occurring after they registered a Korta Mark, their suspicion that Korta's Marks were filed by a non-existent, illegitimate entity, and the lack of evidence to support the conveyance of Korta's Marks between the entities. Even with familial ties and shared counsel, there is no evidence that Playback acted on Korta Records' behalf or stood as its legal successor. Although this argument may carry weight before a jury, it cannot eliminate the genuine disputes of material fact at this procedural stage. Plaintiffs failed to present any evidence demonstrating significant overlap and entanglement between Luis, Playback, and his sons to foreclose a genuine dispute of fact.

Finally, Plaintiffs argue that knowledge of alleged infringement should be imputed to Luis based on the involvement of shared legal counsel. *See* ECF No. [87] at 7-8. In 2013, Hachar, acting on behalf of Playback, openly accused Baloa in USPTO filings of "illegally using the [Baloa Mark] for almost two years" and referencing this use as trademark infringement. *See* ECF No. [85] at ¶25(c); ECF No. [98] at ¶25(c); ECF No. [85-10] at 5. The Parties do not dispute this demonstrates that Hachar and Playback "believed [Baloa's] use of [his Mark] was confusingly similar to [the Los Adolescentes Mark.]" *See* ECF No. [85] at ¶25(c); ECF No. [98] at ¶25(c). These undisputed facts go beyond demonstrating knowledge of the Baloa Mark ***registration***; they indicate Playback's knowledge of Baloa's ***use*** of his Mark and expressly accuse Baloa's use as trademark infringement. This fact, undisputed, likely forecloses a genuine issue of material fact as to Playback and Hachar's knowledge sufficient to begin the delay period for laches for Playback, but Playback is not a party to this litigation. So that does not answer the question.

Plaintiffs seek to thread that needle by arguing that because Hachar simultaneously represented Playback in the USPTO Proceedings and the Cancellation Petition and Luis in the 2014 Action and both Playback and Luis claimed ownership over the same trademark, Hachar's

knowledge must be imputed to Luis under principles of agency.  *See* ECF No. [113] at 6-7.  The Eleventh Circuit has stated that under general agency principles, an attorney's knowledge is imputed to the client regardless of whether the attorney actually communicates that information to the client.  *Cadet v. Florida Dep't of Corr.*, 853 F.3d 1216, 1225 (11th Cir. 2017) (quoting *Maples v. Thomas*, 565 U.S. 266 (2012)).  This is true for agency principles in intellectual property matters; "[i]n order to impute an agent's knowledge to a principal, it must be shown that the agent had duties with respect to trademark matters . . ."  4 *McCarthy on Trademarks and Unfair Competition* § 31:39 (5th ed.).  "The best test for determining whether notice to or knowledge of an agent, such as an attorney, is imputed to his or her principal or client is whether the condition and facts known by the agent were within the sphere of authority of that particular agent."  *Gutter v. E.I. Dupont De Nemours*, 124 F. Supp. 2d 1291, 1310 (S.D. Fla. 2000) (citing 3 Fletcher, Fletcher Cylopedia at § 807 and 807.10); *see also Grippa v. Rubin*, 133 F.4th 1186, 1200 (11th Cir. 2025) ("Under Florida law, 'an attorney acting within the scope of his authority represents his client' such that his actions are attributable to the client and 'his neglect is equivalent to the neglect of the client himself.'") (quoting *Griffith v. Inv. Co.*, 92 Fla. 781, 110 So. 271, 271 (1926)).  The "sphere of authority" test focuses on whether the attorney was acting within the scope of his representation for a *particular* client.  *See Gutter*, 124 F. Supp. 2d at 1310.  "[T]he ultimate determination of whether it will be imputed depends on a factual determination."  *Gutter*, 124 F. Supp. 2d at 1309 (internal citation omitted).

Here, the undisputed facts show that Hachar represented Playback — not Luis — in the USPTO proceedings, including the September 2013 Response and the October 2013 Cancellation Petition.  Hachar's undisputed knowledge of Baloa's use and infringement was obtained in the scope of Hachar's representation of Playback, not Luis.  Plaintiffs point to no authority that would

permit this knowledge to be attributed to Luis, who was not a party to the USPTO Proceedings or the Cancellation Petition.  To the contrary, Luis has consistently disclaimed any affiliation with Playback and its trademark prosecution efforts.  *See, e.g.*, ECF No. [85-14] at ¶¶45–49; ECF No. [85-15] at ¶¶45–49.  Without legal support extending imputation across separate clients, Plaintiffs' theory collapses.  Agency law binds a client to its own attorney's acts and omissions, but it does not allow knowledge imputed to one client (Playback) to be automatically imputed to another (Luis), and Plaintiffs do not direct the Court to any authority that would support such an imputation of knowledge.  Accordingly, the knowledge Hachar gained while representing Playback in the USPTO Proceedings or the Cancellation Petition cannot, as a matter of law, be imputed to Luis.

The record before the Court thus presents genuine factual disputes regarding precisely when Korta Records reasonably knew — or should have known — of actionable consumer confusion sufficient to trigger trademark infringement claims.  As discussed earlier, Plaintiffs have not adequately established Korta Records' actual or constructive notice sufficient to eliminate these factual disputes.  Thus, Korta Records progressive encroachment argument survives for purposes of summary judgment — not because it is inherently strong given the overlapping market segments, but rather because the initial question of Korta Records' actual or constructive notice remains unresolved.

### 2. Excuse

The second element of laches requires Plaintiffs to demonstrate that Korta Records' delay in asserting its trademark infringement claims was unjustified or inexcusable.  *See Pinnacle*, 7 F.4th at 1009; *AmBrit*, 812 F.2d at 1545.  The justification or excuse element ensures trademark holders do not strategically delay enforcement to the detriment of alleged infringers who continue investing resources in developing their businesses or brands.  *See Pinnacle*, 7 F.4th at 1009–10.

Plaintiffs argue that Korta Records has no valid excuse for its delay, emphasizing that Korta Records took no affirmative steps to resolve or address Plaintiffs' use of Baloa's Mark.  *See* ECF No. [87] at 8.  Korta Records' excuse and delay arguments are the same — that its delay, if any, is excusable under the progressive encroachment doctrine.  *See* ECF No. [97] at 7.  With no additional arguments or evidentiary support, Plaintiffs fail to satisfy the second prong.

If the evidence ultimately presented at trial demonstrates that Korta Records had actionable knowledge or notice of Plaintiffs' trademark usage and the likelihood of confusion substantially earlier, then Plaintiffs may ultimately prevail on this issue.  At present, however, the unresolved factual issues regarding Korta Records' knowledge preclude a definitive determination of excuse at this stage, thereby precluding summary judgment.

### 3. Undue Prejudice

As to the third element, Plaintiffs argue they will suffer undue prejudice if Korta Records is permitted to pursue its trademark counterclaims.  *See* ECF No. [87] at 8-9.  Courts recognize two types of prejudice from delayed trademark suits: evidentiary and economic.  *See Pinnacle*, 7 F.4th at 1010.  To establish economic prejudice, courts examine whether, during the delay, defendants made investments or business decisions they would not have undertaken had suit been filed promptly.  *See id*.; *AmBrit*, 812 F.2d at 1546–47.  The Eleventh Circuit has considered, for example, expenditures on advertising, marketing, brand development, and capital investments tied to the contested mark.  *See Pinnacle*, 7 F.4th at 1010; *AmBrit*, 812 F.2d at 1546–47.  For example, in *Pinnacle*, the Court credited testimony that the defendant spent nearly $2 million promoting its business and brand under the "Pinnacle" name, finding the business and the mark inseparable.  *See Pinnacle*, 7 F.4th at 1010.

Plaintiffs focus their argument on the economic prejudice, stating that "Baloa has invested much time and money promoting himself and his band PORFI BALOA Y SUS ADOLESCENTES in building his base of consumers and developing goodwill associated with his trademarks."  *See* ECF No. [87] at 9.  In support, Plaintiffs cite to the Baloa Mark registration and the 2014 Action. *See id*.  Neither of these documents provides any evidence of actual expenditures showing the amount of time and money expended in developing its business under the Baloa Mark.  Without evidentiary support sufficient to foreclose a genuine issue of material fact, Plaintiffs cannot establish that they suffered economic prejudice from Korta Records' delay, if any, in bringing its trademark infringement claims.

Moreover, Korta Records argues that, even if some prejudice could be shown, the public's interest in avoiding consumer confusion outweighs the prejudice.  *See* ECF No. [97] at 9-10.  Korta Records argues that "[Plaintiffs] have intentionally scheduled performances, under the Infringing Mark, in the same locations as Korta Records' Band only a short period before[,]" causing consumer confusion.  *See* ECF No. [97] at 9.  Yet, Korta Records' evidentiary support suffers from the same deficiency it criticizes in Plaintiffs' submissions.  Korta Records relies solely on Leonor's deposition testimony expressing concern that the Baloa Mark could cause confusion among promoters and the public, without establishing that any actual confusion occurred.  *See* ECF No. [129] at 19:15-20:19.  Korta Records fails to provide actual evidence — such as ticketing records, promotional materials, or testimony — demonstrating that such overlap occurred or that consumers were in fact confused.  Whether the public interest ultimately outweighs the prejudice is again fact-intensive and not suitable for summary judgment based on this record.

Applying the legal standards the Eleventh Circuit articulated in *Pinnacle*, the Court concludes that material factual disputes exist regarding the timing and nature of Korta Records'

knowledge of infringement, the applicability of progressive encroachment, the excusability of any delay, and the degree of prejudice.  These disputes preclude resolution at the summary-judgment stage.  As a result, I respectfully **RECOMMEND** that summary judgment in Plaintiffs' favor as to their affirmative defense of laches **BE DENIED**.

### B. Second Affirmative Defense: Acquiescence

To succeed on a defense of acquiescence, the moving party must prove: (1) the plaintiff actively represented that it would not assert a right or claim; (2) the delay between the active representation and the assertion of the right was not excusable; and (3) the delay caused undue prejudice to the defendant.  *See Univ. of Ala. Bd.,* 683 F.3d at 1281.  Unlike laches, which can arise from silence or inaction, acquiescence requires affirmative conduct that signals a clear intent to permit the infringing use.  *Angel Flight,* 522 F.3d at 1207.

Plaintiffs' acquiescence argument hinges on the dismissal of Playback's Cancellation Petition.  *See* ECF No. [87] at 10-11.  As previously stated, Plaintiffs' attempt to link Playback's conduct to Korta Records misses the mark.  While there may be familial ties and shared counsel between Luis and his sons, there is no evidence that Playback was acting on behalf of, or in legal succession to, Korta Records.  Luis and Leonor both testified that Luis had no ownership interest in Playback.  Without concrete evidence of agency or privity, Playback's conduct cannot be imputed to Korta Records for purposes of acquiescence.

Even if Playback's actions could be imputed to Korta Records, the dismissal of the Cancellation Petition did not convey any form of consent.  The proceeding's dismissal with prejudice — due solely to Playback's failure to respond — cannot reasonably be interpreted as an active assurance that no legal action would be taken.  At most, it reflects procedural abandonment, not substantive consent.  Even under a generous reading of the record, nothing suggests that Korta

Records, or Luis, ever assured Baloa, directly or indirectly, that he could use the disputed mark

without objection.  In fact, the express accusation of infringement in 2013 is the opposite of active

consent.  Nor does the 2014 Action suggest this.  Baloa's own allegations in the 2014 Action state

that Luis, through associates, contacted venues where Baloa was scheduled to perform, asserted

that Baloa had no right to use the Baloa Mark, requested cancellation of the performances, and

threatened legal action against venue owners who declined to comply.  *See* ECF No. [85-14] at

¶51.  The State Defendants responded in their answer, stating that "it is [Baloa] that has illegally

co-opted [Luis'] groups['] formal and commonly used tradenames."  *See* ECF No. [85-15] at ¶49.

Courts in this Circuit have rejected acquiescence defenses under similar circumstances.

This argument and record parallels *Buccellati Holding Italia Spa v. Laura Buccellati, LLC*, 5 F.

Supp. 3d 1368, 1375 (S.D. Fla. 2014).  There, the court rejected an acquiescence defense despite

defendants' claim that they believed they had consent based on secondhand conversations.  *See id*.

at 1375.  In *Buccellati*, the court emphasized that a third party's statements and defendants'

subjective impressions could not substitute for clear, affirmative permission — especially when

contemporaneous communications from plaintiffs expressly objected to the defendants' conduct

and offered only conditional licensing.  *See id*. at 1375-76.

The record here is even clearer.  Unlike in *Buccellati*, where defendants at least pointed to

purported conversations suggesting tolerance, Plaintiffs have no basis to claim that Korta Records

or Luis ever conveyed consent.  To the contrary, Playback's USPTO Response expressly alleged

infringement, the Cancellation petition dismissal reflected only procedural abandonment, and

subsequent conduct — including threats to venues and litigation positions — consistently

reaffirmed opposition to Baloa's use of his Mark.  As in *Buccellati*, mere silence or delay is legally

insufficient to establish acquiescence; but here, the record reflects not silence, but affirmative

objection.  Accordingly, Plaintiffs' acquiescence defense fails as a matter of law.  The Court need not reach the second and third elements as they mirror those of laches, and the Court has already determined that excusable delay and undue prejudice are not satisfied based on the summary judgment record.  As a result, I respectfully **RECOMMEND** that summary judgment in Plaintiffs' favor as to their affirmative defense of acquiescence **BE DENIED**.

### B. Trademark Dilution (Count III)

Unlike Plaintiffs' two prior arguments involving their affirmative defenses, on the matter of trade dilution, it is Korta Records that has the burden to prove the elements of this claim. Accordingly, Plaintiffs' third argument, that Korta Records cannot show its Marks are famous, places the initial burden on Korta Records — to present evidence beyond the pleadings sufficient for a reasonable jury to find in its favor.  *See Celotex*, 477 U.S. at 322; *Shiver*, 549 F.3d at 1343. Florida law provides that "[t]he owner of a mark that is famous in this state" may enjoin another's commercial use that is likely to dilute the mark's distinctiveness.  *See* Fla. Stat. § 495.151.  Courts have consistently held that the standard for Florida dilution is "essentially the same" as under the Lanham Act.  *Fla. Int'l Univ. Bd.*, 91 F. Supp. 3d at 1286.  The threshold issue is whether the asserted marks are "famous."  "Trademark dilution claims are limited to truly famous marks such as Budweiser beer, Camel cigarettes, and Barbie dolls."  *Brain Pharma*, 858 F. Supp. 2d at 1357 As the Federal Circuit has explained, "[f]ame for likelihood of confusion and fame for dilution are distinct concepts, and dilution fame requires a more stringent showing."  *Coach Servs.*, 668 F.3d at 1373.  A mark must rise to the level of a "household name" with widespread public recognition. *Id*.

Plaintiffs argue that Korta Records cannot establish fame because its Marks are, at best, known within the niche Latin and salsa music industry, not among the general consuming public.

*See* ECF No. [87] at 11-13.  Plaintiffs emphasize that niche fame is insufficient and that the record lacks evidence of widespread recognition across Florida or the United States.  *See id*.

Plaintiffs are correct in that Defendants have not presented evidence from which a reasonable jury could find that the asserted marks are "famous" under Florida law.  As courts have repeatedly emphasized, the measure of dilution fame is not limited by market or geography — the mark must be "widely recognized by the general consuming public of the United States."  *Brain Pharma*, 858 F. Supp. 2d at 1357 (emphasis added).  Thus, recognition among a limited audience or within a particular industry does not suffice.  In *Bd. of Regents, Univ. of Tex. Sys. ex rel. Univ. of Tex. at Austin v. KST Elec., Ltd.*, 550 F. Supp. 2d 657 (W.D. Tex. 2008), the University of Texas pursued a claim of trademark dilution of its trademarked longhorn silhouette logo.  The district court, analyzing the evidence the University of Texas submitted in support of its dilution claim, concluded that it was "evidence of 'niche' fame," which is a category of fame to which § 1125(c) does not apply.  *Id.*  Evidence that the University of Texas's football games are regularly televised on a nationwide basis prominently featuring the longhorn silhouette logo, that the men's college basketball team's games were televised 97 times over five seasons, that 35 million spectators watched the Bowl Championship Series Rose Bowl or 9 million spectators watched the Alamo Bowl in which the University of Texas football team played, that University of Texas football players were featured on the cover of Sports Illustrated repeatedly between 1963 and 2006, that the Collegiate Licensing Company reported it holds the record for most royalties earned in a single year, that *Forbes* valued its football program as the second most valuable in the country, and that retail sales of its products in stores, such as Wal-Mart and Target totaled nearly $400 million from 2005 to 2006, among other evidence, all related to "niche fame" but was not evidence that the mark was "widely recognized by the general consuming public of the United States."  *Id.*  The

district court reasoned that, based on this evidence, "it is not at all clear that if one is not a college football fan (or, to a much lesser extent, college baseball or basketball fan) would recognize the [longhorn silhouette logo] as being associated with the [University of Texas], as all of the evidence relates to the use of the logo in sporting events." *Id.* The popularity of the University of Texas's athletic program did "not necessarily mean that the longhorn logo is so ubiquitous and well-known to stand toe-to-toe with Buick or KODAK." *Id.*

Unlike the University of Texas's evidence of "niche fame" in college athletics, Korta Records' showing here falls well short of even that limited level of recognition. The University of Texas presented extensive evidence of nationwide exposure — televised sporting events reaching tens of millions of viewers, national media coverage, and hundreds of millions of dollars in merchandise sales — yet the court still concluded that such proof demonstrated only "niche fame" within collegiate athletics, not fame "among the general consuming public of the United States." *Id.* at 678. Here, Korta Records has not presented anything close to that magnitude of evidence even for its niche industry.[6] The record contains only generalized references to performances, awards, and streaming metrics, none of which establish that "Adolescentes Orquesta" has achieved consistent or pervasive recognition even within the salsa or Latin music

---

[6] Korta Records relies solely on *Four Seasons Hotels & Resorts B.V. v. Consorcio Barr, S.A.*, 267 F. Supp. 2d 1268 (S.D. Fla. 2003), *aff'd in part, rev'd in part sub nom. Four Seasons Hotels v. Consorcio Barr S.A.*, 138 F. App'x 297 (11th Cir. 2005). *See* ECF No. [97] at 13. The record here does not remotely establish that "Adolescentes Orquesta," or derivatives thereof, are as widely recognized or as famous as the marks in *Four Seasons*, which the plaintiff supported with evidence of extensive global advertising, worldwide presence, and recognition across industries. Korta Records primarily cites to the Korta Marks' registrations and that the registration reflects a claimed use since 1995. *See* ECF No. [97] at 14. Although the creation of the Band and the name "Adolescentes Orquesta" in 1995 is undisputed, the use alone does not make the Korta Mark *per se* famous. Korta Records' citations to Luis and Leonor's testimony only discuss trademark registrations in the United States and internationally. This testimony does not support the assertion that the name "Adolescentes Orquesta" "gained international recognition in the music industry, as showcased by its awards and streaming numbers." *See* ECF No. [97] at 14.

community, much less among the general consuming public.  Moreover, the relevant territorial scope for a dilution analysis is the United States, not any foreign market.  *See Brain Pharma, LLC*, 858 F. Supp. 2d at 1357. Accordingly, even if Korta Records could demonstrate that "Adolescentes Orquesta" enjoys significant popularity in Venezuela or other Latin American countries, such foreign recognition would not move the needle in the fame analysis.  Thus, if the longhorn logo — supported by overwhelming evidence of nationwide visibility — failed to qualify as "truly famous," the Korta Marks, supported by far less, cannot plausibly meet that stringent standard.  *See Bd. of Regents, Univ. of Texas Sys. ex rel. Univ. of Texas at Austin*, 550 F. Supp. 2d at 678; *Brain Pharma*, 858 F. Supp. 2d at 1357.

Even viewing the evidence in the light most favorable to Korta Records, there is insufficient proof to suggest that its Marks have achieved the level of widespread public recognition necessary for a dilution claim.  While Defendants have shown long use and the existence of federal registrations, these facts do not establish the kind of widespread, general public recognition required for dilution.  *Brain Pharma*, 858 F. Supp. 2d at 1357.   Even assuming the Korta Marks are well known in Latin music circles, there is no evidence that they are "household names" across Florida or the United States, comparable to marks like "Budweiser" or "Barbie." Because fame is an essential element of a dilution claim, and Korta Records has not produced sufficient evidence to raise a triable issue on this element, summary judgment in Plaintiffs' favor is warranted.  As a result, I respectfully **RECOMMEND** that summary judgment **BE GRANTED** in Plaintiffs' favor as to Count III of Defendants' Counterclaims.

CASE NO. 24-CV-20522-LEIBOWITZ/Elfenbein

## V.      CONCLUSION

Accordingly, I respectfully **RECOMMEND** that Plaintiffs/Counter-Defendants Victor Porfirio Baloa Diaz and Porfi Music, LLC's Motion for Summary Judgment on Defendant Korta Records Co.'s Counterclaims, **ECF No. [87]**, be **GRANTED in part** and **DENIED in part** as follows:

1.      As to **Counts I and II**, I recommend that summary judgment be **DENIED**; and

2.      As to **Count III**, I recommend that summary judgment be **GRANTED**.

Pursuant to Local Magistrate Rule 4(b), the parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable David S. Leibowitz, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**RESPECTFULLY SUBMITTED** in Chambers in Miami, Florida on November 4, 2024.

**MARTY FULGUEIRA ELFENBEIN**
**UNITED STATES MAGISTRATE JUDGE**

cc:  All Counsel of Record